IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal Case No. 3:17cr89 (HEH) |
| | ) | |
| DELFINO NATALIO DE LEON- | ) | |
| RAMIREZ, | ) | |
| Defendant. | ) | |
| | ) | |

## REPORT AND RECOMMENDATION

This matter comes before the Court on Defendant Delfino Natalio De Leon-Ramirez's

("Defendant") Motion to Dismiss the Indictment on Statute of Limitations Grounds (ECF No.

8.), after having been referred to the undersigned by United States District Judge Henry E.

Hudson (ECF No. 17).  In his motion, Defendant asserts that his prosecution is time-barred,

because federal immigration officials had notice of his presence in the United States in 2007 and,

therefore, prosecution needed to commence by 2012.  As discussed below, the Court agrees that

Immigration and Customs Enforcement ("ICE") officials had actual notice of Defendant's

unlawful presence in the United States in 2007; however, the Court also concludes that

Defendant's fugitive status tolled the five-year statute of limitations.  Consequently, the Court

recommends that Defendant's Motion to Dismiss the Indictment (ECF No. 8) be DENIED.

## STATEMENT OF FACTS

On September 1, 2017, the Court conducted an evidentiary hearing during which

Chesterfield County Police Sgt. Bradford Conner and ICE Deportation Officer William Chin

testified.  The parties also stipulated to the testimony of Theresa Ward Justice, Operations

Manager at the Emergency Communications Center in Chesterfield County, and Chesterfield

County Sheriff's Office Sgt. Newcomb.   (Def.'s Ex. 4).[1]  On September 20, 2017, the Court reopened the evidentiary hearing to continue the examination of Officer Chin after Defendant was provided an opportunity to review his Alien file ("A-file").

Based on the testimony and evidence presented at those hearings, and the submissions of the parties, the Court finds the following facts:[2]

1. Defendant, a Guatemalan citizen, first illegally entered the United States in or about January 1995 at or near El Paso, Texas. (Transcript of Hearing at 34, *United States v. De Leon-Ramirez* (Sept. 1, 2017) (No. 3:17cr89) ("Sept. 1 Tr."); Gov't Mem. in Opp'n to Def.'s Mot. to Dismiss Indictment ("Gov't Mem. Opp'n") (ECF No. 16) at 2, ¶¶ 1-2.)

2. After a number of encounters with local law enforcement,[3] officials with the Homeland Security Office of Investigations, located in Norfolk, Virginia, arrested Defendant on November 9, 2004, and charged him with producing counterfeit immigration documents. (Sept. 1 Tr. at 36; Gov't Mem. Opp'n at 2, ¶ 7.)

3. After Defendant pleaded guilty, this Court sentenced him to fifteen months' incarceration on July 15, 2005. (Sept. 1 Tr. at 36.) On February 6, 2006, the Government served Defendant in person with an I-851A Administrative Removal Order and ordered him removed to Guatemala. (Sept. 1 Tr. at 36-37; Gov't Mem. Opp'n at 3, ¶¶ 9-10.)

4. One month later, on March 6, 2006, authorities deported Defendant to Guatemala. (Def.'s Mot. to Dismiss Indictment ("Def.'s Mot. Dismiss") (ECF No. 8) at 1).

5. Defendant subsequently re-entered the United States on an unknown date and at an unknown location, without having obtained the express consent of the Attorney General or his successor, the Secretary of Homeland Security, for admission into the United

---

[1]  The parties' stipulation lacks a first name for Sgt. Newcomb. (Def.'s Ex. 4.) Defendant presented the six exhibits referenced herein during the hearings conducted on September 1, 2017 (ECF No. 19) and September 20, 2017 (ECF No. 23), and the Court admitted them into evidence.

[2]  Neither party challenged the credibility of any of the witnesses; therefore, the Court need not resolve any credibility disputes.

[3]  On August 19, 2001, Richmond police arrested and charged Defendant with assault and battery. (Sept. 1 Tr. at 34; Gov't Mem. Opp'n at 2, ¶ 3.) The state court subsequently dismissed that charge. (Gov't Mem. Opp'n at 2, ¶ 3.) Three years later, on April 20, 2004, the Hanover General District Court convicted Defendant of public swearing or intoxication. (Gov't Mem. Opp'n at 2, ¶ 5.) Local authorities did not contact ICE officials on either occasion. (Sept. 1 Tr. at 34-36; Gov't Mem. Opp'n at 2, ¶¶ 4, 6.)

States.  (Indictment (ECF No. 3); Gov't's Mem. Opp'n at 3, ¶ 12.)

6. On February 19, 2007, Chesterfield County Sheriff's Office Sgt. Bradford Conner arrested Defendant and charged him with trespassing and larceny.  (Sept. 1 Tr. at 5; Def.'s Ex. 1 at 1-2.)[4]

7. Upon arrest, Defendant presented Sgt. Conner with an identification card from Mexico showing the name "Enrique Roblero Escobar."  (Def.'s Ex. 1 at 4.)

8. Sgt. Conner took Defendant into custody and directed the booking department to run Defendant's fingerprints.  (Sept. 1 Tr. at 6.)

9. As a standard practice and identification procedure, the Chesterfield County Police Department fingerprints Hispanic males brought into booking at the Chesterfield County Jail.  (Sept. 1 Tr. at 6; Def.'s Ex. 4.) According to the stipulated testimony of Sgt. Newcomb with the Chesterfield County Sherriff's Office, the booking department takes the suspect's fingerprints and requests completion of an Immigration Alien Query ("IAQ") through the Virginia Criminal Information Network ("VCIN") and the National Criminal Information Center ("NCIC").  (Def.'s Ex. 4.) The Sherriff's Office prints and places the completed IAQ in the individual's file.  (Def.'s Ex. 4.) Upon request from an officer, the Chesterfield Emergency Communications Center ("CECC") sends a teletype message ("TTY") to ICE that contains the information from the IAQ.  (Def.'s Ex. 4.)

10. ICE Deportation Officer William Chin further explained that when a local law enforcement agency submits an IAQ to the NCIC, notice goes out to a law enforcement support center in Burlington, Vermont.  (Sept. 1 Tr. at 40.) The support center then transmits the notice to the appropriate ICE field office.  (Sept. 1 Tr. at 40.) Next, the local ICE supervisor assigns an agent to interview the subject of the IAQ to determine if the individual qualifies as a removable alien.  (Sept. 1 Tr. at 41.) The agent completes an I-213 form when he conducts the interview.  (Sept. 1 Tr. at 41.) Finally, the IAQ, the notice from the Vermont support center and the I-213 form are placed in the A-file. (Sept. 1 Tr. at 41.)

11. Officer Chin explained that an IAQ typically contains an alien's Fingerprint Identification Number ("FIN"), information pertaining to the alien's arrest, the name used by the alien when arrested and the date and port of the alien's last removal.  (Transcript of Hearing at 10-13, 17-18, *United States v. De Leon-Ramirez* (Sept. 20, 2017) (3:17cr89) ("Sept. 20 Tr.").)

12. When the booking department in Chesterfield ran Defendant's fingerprints, the results revealed that the FBI had a record of Defendant under the name "Delfino-Puac Deleon"

---

[4]     Defendant concedes that Chesterfield police charged him under the name "Delfino Puac-Deleon," an alias previously known to ICE and contained in his previous presentence report and NCIC records.  (Sept. 1 Tr. at 49; Def.'s Mot. Dismiss at 2.)

and that Virginia authorities knew Defendant as "Alejandro Hernandez." (Sept. 1 Tr. at 6; Def.'s Ex. 1 at 4.)

13. In the Chesterfield County Police Incident Full Report ("Chesterfield Police Report"), Sgt. Conner stated that, after tying together Defendant's multiple aliases, he contacted the CECC and requested them to send ICE a TTY to determine whether ICE wished to issue a detainer. (Sept. 1 Tr. at 7-8; Def.'s Ex. 1 at 4.)

14. Sgt. Newcomb received no response from ICE as of February 19, 2007. (Sept. 1 Tr. at 7; Def.'s Ex. 1 at 3-4.)

15. The stipulated testimony of Theresa Ward Justice, CECC Operations Manager and records custodian, explained that ICE requests officers to complete an IAQ on all aliens under arrest or investigation. (Def.'s Ex. 4.) Ms. Justice, who has been with the CECC since 1998, further testified that, based on her experience and training, when an officer requests the CECC to send a TTY to ICE, such a request is completed. (Def.'s Ex. 4.)

16. Ms. Justice further indicated that ICE may reply to an IAQ within "minutes, hours or days." (Def.'s Ex. 4.) Sgt. Conner testified that he did not consistently receive responses from ICE when he requested the CECC to send ICE a TTY. (Sept. 1 Tr. at 22.) When the CECC does receive a reply from ICE, Ms. Justice explained that CECC personnel place it in the "pass on book," an internal storage mechanism used by TTY operators. (Def.'s Ex. 4.)

17. Due to the records purging timeline imposed by the Library of Virginia Records Management and Retention schedules, no records exist confirming whether the Chesterfield Police Department completed an IAQ or whether the CECC sent a TTY to ICE. (Def.'s Ex. 4.)

18. However, Officer Chin testified that, in addition to receiving TTYs, ICE may also receive notification from local law enforcement regarding suspect aliens via telephone or fax, and that ICE also used those methods of communication in 2007. (Sept. 1 Tr. at 52-53.)

19. The Chesterfield General District Court released Defendant on bond on February 28, 2007. (Sept. 1 Tr. at 20-21.)

20. The only bond paperwork signed by Defendant lists a hearing date of March 30, 2007. (Sept. 1 Tr. at 23; Def.'s Ex. 3.) Other paperwork lists Defendant's hearing date as April 30, 2007 — the date that the state court actually scheduled Defendant's hearing. (Sept. 1 Tr. at 25; Def.'s Ex. 2; Def.'s Ex. 3.)

21. Defendant failed to appear on April 30, 2007 to face his pending concealment and trespassing charges. (Sept. 1 Tr. at 25; Def.'s Ex. 2.)

22. The court issued a capias warrant for his arrest on May 1, 2007. (Sept. 1 Tr. at 24, Def.'s Ex. 2.) The warrant section of the Chesterfield Police Report instructs authorities to "page Farmer if 10-95 as wanted by ICE." (Sept. 1 Tr. at 8; Def.'s Ex. 1 at 3.) Sgt. Conner testified that this notation instructed officers to notify John Farmer, the former Chesterfield County fugitive detective assigned to Defendant's case, in the event of Defendant's arrest. (Sept. 1 Tr. at 8-9.)

23. On May 13, 2007, Detective Farmer emailed Gene Carr, a United States Marshals Service Analyst serving the Capital Area Regional Fugitive Task Force in 2007. (Def.'s Ex. 5.) Detective Farmer listed Defendant's aliases (Delfino Puac-Deleon and Alejandro Hernandez) and asked Carr whether he had a contact in the United States Probation Office to assist in his search for Defendant. (Def.'s Ex. 5.)

24. On May 16, 2007, Carr replied to Detective Farmer, stating that authorities previously deported Defendant on March 8, 2006, and inquiring about Defendant's trespassing and larceny charges. (Def.'s Ex. 5.) Detective Farmer responded in relevant part: "I have talked to Lee Gaines with ICE . . . ." (Sept. 1 Tr. at 29; Def.'s Ex. 5.) At that time, Lee Gaines served as the ICE Supervisor of the Richmond field office. (Sept. 1 Tr. at 29.) In his email, Detective Farmer also asked whether Defendant had continuing probation obligations. (Sept. 1 Tr. at 29; Def.'s Ex. 5.)

25. That same day, Carr forwarded his communications with Detective Farmer to United States Probation Officer Kristen James. (Sept. 1 Tr. at 28; Def.'s Ex. 5.)

26. On June 25, 2007, Officer James executed a petition on supervised release, notifying the Court that Defendant violated the conditions of his July 2005 supervised release. (Pet. on Supervised Release, *United States v. Delfino Natalio De Leon-Ramirez*, 3:05cr26 ("Pet. on Supervised Release").)

27. On July 2, 2007, the Court issued a warrant for Defendant to appear and show cause as to why the Court should not revoke his supervised release. (Pet. on. Supervised Release.)

28. Defendant remained a fugitive on the outstanding capias warrant from Chesterfield until May 26, 2016, when Richmond police arrested and charged him with assault and battery. (Gov't Mem. Opp'n at 4, ¶¶ 17-18.)

29. Richmond authorities released Defendant on bond, and he once more failed to appear for his court hearing. (Gov't Mem. Opp'n at 4-5, ¶ 18.) The Richmond court issued another capias warrant for his arrest. (Gov't Mem. Opp'n at 4-5, ¶ 18.)[5]

30. On May 31, 2016, a member of the U.S. Marshals Capital Area Regional Fugitive Task Force sent an informal notice to a member of the Richmond, ICE, Fugitive Operations

---

[5]     Richmond authorities did not notify ICE of the 2016 capias warrant. (Gov't Mem. Opp'n at 4, ¶ 19.)

Team in North Chesterfield concerning Defendant's 2016 capias. (Gov't's Mem. Opp'n at 6, ¶ 20.)

31. After receiving the informal notice, ICE subsequently commenced a fugitive investigation, led by Officer Chin. (Sept. 1 Tr. at 42-43.)

32. As part of the investigation, Officer Chin received Defendant's A-file from ICE's national record center. (Sept. 20 Tr. at 19; Def.'s Ex. 6.)

33. The first page in Defendant's A-file contained a case closure summary with two yellow post-it notes affixed to the page. (Sept. 20 Tr. at 5; Def.'s Ex. 6.) According to Officer Chin, the closure summary is usually the last document placed in the A-file before it is shipped to ICE's national record center. (Sept. 20 Tr. at 23.)

34. The post-it notes contain the following relevant information, as verified by Officer Chin:
    a. "3117 Walmsley," where Defendant resided at the time of his 2004 arrest, pre-deportation;
    b. "11/09/04," the date that Norfolk special agents arrested Defendant for producing counterfeit immigration documents;[6]
    c. "NOR 05 11 10," which refers to ICE's Norfolk office and the event number used by ICE to track arrests;
    d. "FIN 16115017, only 1 app," which refers to Defendant's Fingerprint Identification Number ("FIN") and one apprehension or arrest;
    e. "Puac-Deleon, Delfino," one of Defendant's aliases;
    f. "6011 Cricklewood # B," the address associated with Defendant's 2007 arrest in Chesterfield;
    g. "851A 1/6/06," which refers to the immigration form ordering Defendant's removal and the date that the administrative removal order was signed;
    h. "3/5/06 ATL," the date that authorities deported Defendant from Atlanta;
    i. "15 months on 7/15/05-sentence for FARC, 18 USC 1564(a), 11/24/04-conv." This refers to Defendant's federal conviction for producing fraudulent alien resident cards. (Sept. 20 Tr. at 13-18; Gov't's Suppl. Mem. in Opp'n to Def.'s Mot. to Dismiss (ECF No.22) at 8.)

35. Officer Chin testified that he could not identify the handwriting on the post-it notes nor the exact date when the post-it notes went into the A-file. (Sept. 20 Tr. at 20.) However, Officer Chin explained that no one at the ICE record center would have placed the post-it

---

[6]    In their Supplemental Brief in Opposition to Defendant's Motion to Dismiss (ECF No. 22), the Government states that this line "appears to be a typo as . . . [D]efendant was arrested by Norfolk Special Agents on 11/09/2005." But Officer Chin and the case closure summary in Defendant's A-file confirm that November 9, 2004 is the date that officials apprehended Defendant in connection with producing counterfeit immigration documents. (Sept. 1 Tr. at 36; Def.'s ex. 6.) November 9, 2004 is also the date that the Government listed in their first Brief in Opposition to Defendant's Motion to Dismiss (ECF No. 16). (Gov't's Mem. Opp'n at 2, ¶ 7.)

notes in the A-file. (Sept. 20 Tr. at 20-21.) Further, no one in Officer Chin's Richmond office, such as his assistant, placed the post-it notes in the A-file. (Sept. 20 Tr. at 20.) Accordingly, Officer Chin testified that the post-it notes had to be placed in the A-file sometime after March 15, 2006 (the date on the case closure summary) but before 2016, when Officer Chin received the A-file. (Sept. 20 Tr. at 22-24.)

36. Although Defendant's A-file did not contain an IAQ documenting his 2007 arrest in Chesterfield, Officer Chin testified that some of the information listed on the post-it notes comports with information that would appear on an IAQ. (Sept. 20 Tr. at 17-18.)

37. The fugitive task force led by Officer Chin arrested Defendant on June 21, 2017. (Sept. 1 Tr. at 43; Gov't's Mem. Opp'n at 5, ¶ 22.)

38. On July 11, 2017, a federal grand jury returned a single-count indictment against Defendant charging him with illegal reentry, in violation of 8 U.S.C. §§ 1326(a), (b)(2). (Indictment (ECF No. 3); Gov't's Mem. Opp'n at 5, ¶ 22.)

39. Defendant filed the present Motion to Dismiss the Indictment (ECF. No. 8.) on August 11, 2017.

Against this factual backdrop, the Court will now turn to the merits of Defendant's motion.

## ANALYSIS

Defendant seeks dismissal of the indictment, alleging that the prosecution commenced beyond the five-year statute of limitation imposed by 18 U.S.C. § 3282. To resolve the motion, the Court must first determine whether federal immigration officials had notice of Defendant's illegal presence in the United States when he was arrested by the Chesterfield County Police in 2007. Because the Court finds that Defendant has met his burden of establishing that ICE had actual knowledge of his presence in 2007, the Court must then determine whether the statute of limitations was tolled by his fugitive conduct.

## I.   Under 8 U.S.C. § 1326, an Alien is "Found" when Federal Immigration Officials Obtain Knowledge of the Alien's Presence and Illegal Status.

On July 11, 2017, a grand jury charged Defendant with violating 8 U.S.C. § 1326. (Indictment (ECF No. 3.).) An alien violates § 1326 when he unlawfully (i) enters; (ii) attempts to enter; or, (iii) is "found" in the United States. *United States v. Hoenes-De La Cruz*, 114 F.

7

App'x 524, 526 (4th Cir. 2004). "The five-year general statute of limitations in 18 U.S.C.

§ 3282 applies to this violation since the limitation applies to any non-capital offense . . . The

statute of limitations is an affirmative defense in which the defendant bears the burden." *United

States v. Merentes-Vargas*, No. 3:09cr086, 2009 WL 1587291, at \*3 (E.D. Va. June 5, 2009),

*aff'd sub nom. United States v. Vargas*, 408 F. App'x 676 (4th Cir. 2011) (citing *United States v.

Husband*, 119 F. App'x 475, 480 (4th Cir. 2005)) (additional citations omitted).

The Fourth Circuit has recognized that § 1326 is a continuing offense. *See United States

v. Uribe-Rios*, 558 F.3d 347, 354 (4th Cir. 2009) (discussing nature of § 1326 as a continuing

offense); *Hoenes-De La Cruz*, 114 F. App'x at 526 (the offense is a "continuing violation that

commences with the illegal entry") (quoting *United States v. Mendez-Cruz*, 329 F.3d 885, 889

(D.C. Cir. 2003)); *Merentes-Vargas*, 2009 WL 1587291, at \*5 ("a violation of 8 U.S.C. § 1326 is

a continuing offense"); *United States v. Ibarra-Reyes*, No. 3:07cr345, 2007 WL 4287753, at \*4

(E.D. Va. Dec. 5, 2007) (same); *United States v. Rivera*, 942 F. Supp. 247, 250 (E.D. Va. 1996)

(an alien violates § 1326 both upon illegal reentry and "whenever he is later 'found' within this

country"). Accordingly, the limitations period does not begin to run until the offense is

complete. When an alien surreptitiously reenters the country, the offense is completed when the

alien is "found" in the United States. 8 U.S.C. § 1326; *Hoenes-De La Cruz*, 114 F. App'x at

526; *Merentes-Vargas*, 2009 WL 1587291, at \*6.

Courts vary as to the precise point in time when an alien is "found" for § 1326 purposes.

The Fourth Circuit has broadly held that, under § 1326, an alien is found in the United States

when federal immigration officials discover the alien's physical presence and illegal status.

*United States v. Perez-Garcia*, 462 F. App'x 336, 338 (4th Cir. 2012); *Uribe-Rios*, 558 F.3d at

354 (noting that courts have regularly held that an alien is found only when *federal*, not state,

8

immigration authorities discover the alien's illegal presence). The moment of discovery may range from the date that authorities arrest the alien for violating § 1326, to the time "when the ICE agent actually interviews and confirms the defendant is an illegal reentry." *Ibarra-Reyes*, 2007 WL 4287753, at *3. *Compare Hoenes-De La Cruz*, 114 F. App'x at 526 (alien found when arrested), *and Rivera*, 942 F. Supp. at 249 (alien found when "discovered . . . and arrested by INS agents"), *with Merentes-Vargas*, 2009 WL 1587291, at *6 (explaining that the offense continues until the alien is found by ICE agents), *and Ibarra-Reyes*, 2007 WL 4287753, at *3 (alien found when ICE agent interviewed and confirmed alien's illegal status). Here, Defendant's motion focuses on the date that federal immigration authorities obtained knowledge of his illegal presence in the United States.

Several circuits interpreting the term "found" under § 1326 have applied a constructive knowledge theory, which triggers the limitations period when federal immigration authorities both know of the alien's physical presence and, "with the exercise of diligence typical of law enforcement authorities," know or *could have known* of "the illegality of the [alien's] presence." *See Vargas*, 408 F. App'x at 679 (collecting cases). For example, in *United States v. Gomez*, the Eighth Circuit held that immigration officials found the defendant alien when INS agents obtained "the information and the means necessary" to learn of his presence and illegal status. 38 F.3d 1031, 1037 (8th Cir. 1994). In *Gomez*, INS received an I-687 form (an application for status as a temporary resident) with the defendant's fingerprints. *Id.* Although the form contained false information, the court reasoned that the INS officials had the ability to discover the defendant's illegal status, because they could have sent his fingerprints to the FBI. *Id.* Sending the fingerprints for comparison would have returned a match and prompted INS to discover the defendant's previous deportation. *Id.* Accordingly, the court held that immigration

9

authorities "found" the defendant on the date by which the FBI would have flagged the defendant's I-687 application, if INS had timely sent his fingerprints for comparison. *Id.* at 1037-38.

Courts will not consider federal immigration authorities to have constructive knowledge of illegal presence where the alien uses multiple aliases or otherwise deceives authorities to conceal his identity. *See Uribe-Rios*, 558 F.3d at 350, 356 (refusing to find that immigration had constructive knowledge where the defendant used over thirty aliases while in the United States). In *Uribe-Rios*, the Fourth Circuit rejected the defendant alien's argument that INS could have discovered his illegal presence, despite his use of multiple aliases, by cross-checking FBI records. *Id.* at 356. Because the defendant's own deception caused INS's lack of knowledge, the court "decline[d] to find a lack of diligence" under a constructive knowledge theory. *Id.*; *see also Perez-Garcia*, 462 F. App'x at 338 (receipt of the defendant's I-130 form did not put immigration officials on constructive notice, because the form contained deceitful information and withheld "highly relevant" facts); *Vargas*, 408 F. App'x at 680 (no constructive knowledge imposed where defendant omitted his Alien number on his I-140 petition, because not "even the most careful and capable immigration official" could have ascertained the defendant's illegal status based on available information).

The constructive knowledge theory likewise does not stretch so far as to impute the knowledge of state law enforcement officials to federal immigration authorities. *Uribe-Rios*, 558 F.3d at 356 ("We decline to adopt a rule that would make federal immigration authorities 'responsible for any immigration-related information discovered in *state* investigations . . . .'") (quoting *United States v. Mercedes*, 287 F.3d 47, 55 (2d Cir. 2002)); *Ibarra-Reyes*, 2007 WL 4287753, at *3 ("apprehension of an alien by local law enforcement does not constitute being

'found' under . . . § 1326."). The fact that a state correctional facility has practices in place to notify ICE officials when they believe they have detained a potentially illegal reentry is, by itself, insufficient to establish federal immigration authorities' constructive knowledge. *Uribe-Rios*, 558 F.3d at 356. Again in *Uribe-Rios*, the court rejected such an argument, because "the record [did] not show that [state] law enforcement actually followed such practice[s.]" *Id.*

The Fourth Circuit, following the Seventh Circuit, favors the actual knowledge theory. *See Uribe-Rios*, 558 F.3d at 355 ("the plain text of section 1326 does not support a theory of constructive knowledge."); *Vega-Pena*, 668 F. Supp. 2d 742, 744-745 (E.D. Va. 2009). Under this theory, the limitations period is triggered when immigration authorities actually discover the alien's illegal presence in the United States, regardless of whether they exercised reasonable investigative diligence before that time. *Uribe-Rios*, 558 F.3d at 355 ("An alien violates . . . § 1326 when the alien 'is at any time found in[] the United States' — not when the alien is 'found or should have been found' in the country . . . "). Immigration authorities' actual knowledge may be inferred from information contained in a defendant's A-file. For example, in *Vega-Pena*, the district court held that immigration officials had actual knowledge of defendant's presence and illegal status, despite his use of aliases on certain forms, because reports in the defendant's A-file showed that INS sent the defendant's fingerprints to the FBI and the returned report revealed his true name and previous deportation. 668 F. Supp. 2d at 747. INS's use of the defendant's earliest identification number and notations indicating his previous deportation further confirmed immigration officials' actual knowledge. *See id.* (discussing INS's practice of consolidating files after discovering that an alien has multiple identification numbers).

While the Fourth Circuit has not adopted a constructive knowledge theory and "read a gloss into section 1326 that the text of the statute does not itself support," it has nevertheless

repeatedly engaged in an alternative constructive knowledge analysis in its decisions. *Uribe-Rios*, 588 F.3d at 354-55; *see also Perez-Garcia*, 462 F. App'x at 338 (affirming the district court's finding that immigration officials lacked constructive knowledge); *Vargas*, 408 F. App'x at 680 (discussing why "a constructive knowledge theory would not benefit [the defendant]"). The district court in *Vega-Pena* explained that, "although the Fourth Circuit plainly views the constructive knowledge with disfavor, a careful reading of the *Uribe-Rios* opinion reveals that such a theory is not rejected outright by the Fourth Circuit." 668 F. Supp. 2d at 745. Rather, the court declined to adopt a constructive knowledge theory on the specific facts of that case, but the opinion "appears to leave the door open for a constructive knowledge theory on the proper set of facts[.]" *Id.* We need not determine here whether the Fourth Circuit would apply a constructive knowledge test to the facts at hand, because the Court finds that Defendant has established that ICE had actual knowledge of his illegal presence in the United States in 2007. *See id.* at 748-49 ("In summary, it is readily apparent that the instant facts differ markedly from the facts in *Uribe-Rios*. Here, the court need not determine whether, 'on these facts,' constructive knowledge is sufficient to establish the date that defendant was 'found' in the United States because the INS had *actual* knowledge of [the defendant's] true identity and status as an illegal re-entrant[.]").

Defendant argues that the Government's July 2017 indictment is time-barred, because federal immigration officials obtained knowledge of his presence in the United States in 2007 when Chesterfield police arrested Defendant, fingerprinted him and — consistent with police department policy — contacted ICE. (Def.'s Mot. Dismiss at 1-3.) The Government responds that ICE's records lack any indicia that Chesterfield police actually notified ICE. (Gov't's Mem. Opp'n at 5.) Specifically, the Government points to the absence of an IAQ from Defendant's A-

file, and asserts that authorities did not "find" Defendant for § 1326 purposes until the fugitive task force led by Officer Chin arrested Defendant on June 21, 2017.  (Gov't's Opp'n Mem. at 9.)

Based on the evidence and testimony presented by the parties, the Court finds that ICE had actual knowledge of Defendant's presence in 2007.  Chesterfield police booked and fingerprinted Defendant following his arrest on February 19, 2007.  (Sept. 1 Tr. at 5-6; Def.'s Ex. 1 at 4.)  At the time, Chesterfield police routinely followed a procedure where, for identification purposes, they fingerprinted Hispanic males brought into custody and completed an IAQ. (Def.'s Ex. 4.)  Authorities complete an IAQ through the VCIN and the NCIC to transmit it to ICE, putting immigration officials on notice that state officials have a previously deported alien in their custody.  (Def.'s Ex. 4.)

In the Chesterfield Police Report, Sgt. Conner explained that Defendant gave the name "Enrique Roblero Escobar," but Defendant's fingerprints revealed that the FBI knew him as "Delfino Puac-Deleon" and that Virginia had record of Defendant as "Alejandro Hernandez." (Def.'s Ex. 1 at 4.)  Sgt. Conner tied these names together and "made contact with dispatch to have them send ICE a [TTY] to see if they wished to issue a detainer on the subject."  (Def.'s Ex. 1 at 4.)  Due to document retention limits, no record exists showing that staff at the CECC actually sent the dispatch to ICE.  (Def.'s Ex. 4.)

Sgt. Conner's report further shows that on May 1, 2007, Chesterfield police issued a capias warrant for Defendant's failure to appear in court on his misdemeanor charges.  (Sept. 1 Tr. at 24, Def.'s Ex. 2.)  In the remarks section, Sgt. Conner instructed officers to page Detective Farmer (the fugitive detective assigned to Defendant's case) if they apprehended Defendant, because he was "wanted by ICE."  (Sept. 1 Tr. at 8; Def.'s Ex. 1 at 3.)  The report also lists Defendant's address as "6011 Cricklewood Dr. # B Richmond, VA 23234."  (Def.'s Ex. 1 at 1.)

Defendant cannot establish that ICE had actual or even constructive knowledge based solely on Chesterfield police records or the presumption that the Chesterfield authorities followed their routine practices and sent notice to ICE. *Uribe-Rios*, 558 F.3d at 356 (refusing to impute state authorities' knowledge on federal immigration officials); *see also Ibarra-Reyes*, 2007 WL 4287753, at \*3 (alien not considered "found" under § 1326 when apprehended by local law enforcement). However, additional evidence, including emails forwarded to United States Probation Officer Kristen James and notes in Defendant's A-file, establish that ICE had actual knowledge of his presence and illegal status in 2007.

Specifically, Defendant's Exhibit 5 consists of emails between Detective Farmer and U.S. Marshals Analyst Gene Carr, who served on the Capital Area Regional Fugitive Task Force in 2007. (Def.'s Ex. 5.) Carr replied to an email from Detective Farmer on May 16, 2007, inquiring about Defendant's trespassing and larceny charges. (Def.'s Ex. 5.) Carr's email refers to Defendant as "Delfino Puac-Deleon AKA Alejandro Hernandez." (Def.'s Ex. 5.) Detective Farmer's response states in relevant part, "I have talked to Lee Gaines with ICE . . . ." (Def.'s Ex. 5.) At that time, Lee Gaines served as the ICE Supervisor of the Richmond field office. (Sept. 1 Tr. at 29.)

Additionally, Defense Exhibit 6 is a copy of Defendant's A-file closure summary. (Def.'s Ex. 6.) The page contains two unsigned and undated post-it notes with the following pertinent information: (1) the date and location that authorities removed Defendant from the United States; (2) "3117 Walmsley" — Defendant's address at the time of his pre-deportation 2004 arrest; (3) an arrest tracking number; (4) Defendant's foreign identification number ("FIN"); (5) "Puac-Deleon, Delfino" — one of the aliases returned to Chesterfield police from Defendant's fingerprints and the name used in the Chesterfield Police Report; and, (6) an arrow

14

pointing from the name "Puac-Deleon, Delfino" to "6011 Cricklewood #B" — Defendant's address at the time of his post-deportation 2007 Chesterfield arrest.  (Sept. 20 Tr. at 13-18, Def.'s Ex. 1; Def.'s Ex.'s 6.)

During the September 20 hearing, ICE Officer Chin testified that an IAQ (the document generated by state police and sent to ICE) typically contains an alien's FIN, the date of the alien's last removal and the port from which authorities deported the alien.  (Sept. 20 Tr. at 10-13, 17-18.)  Once ICE receives an IAQ, officials place a hard copy in the alien's A-file.  (Sept. 1 Tr. at 41.)  Although Defendant's A-file does not contain a printed IAQ, the post-it notes on the closure summary contained information consistent with information typically contained in an IAQ, including Defendant's FIN, his deportation date and the port from which he left.  (Sept. 20 Tr. at 10-18; Def.'s Ex. 6.)  Other information on the post-it notes, such as Defendant's alias and his Cricklewood address, likewise corresponds with the Chesterfield police records from 2007. (Def.'s Ex. 1; Def.'s Ex. 6.)

Although the post-it notes are unsigned and undated, Officer Chin testified that he believed that the post-it notes entered the A-file after March 15, 2006, the date printed on the closure summary, but before ICE personnel retrieved the A-file from archives and sent it to Officer Chin, which occurred sometime in 2016.  (Sept. 20 Tr. at 20-24; Def.'s Ex. 6.)  Based on this timeline and the information listed on the post-it notes, the only reasonable inference that follows is that the post-it notes corroborate Detective Farmer's May 16, 2007 email that stated that he contacted Lee Gaines with ICE.  This inference finds further support from the *informal notice* received by Officer Chin from a member of the Capital Area Fugitive Regional Task Force, which prompted the 2016 fugitive investigation and Defendant's eventual capture in 2017.

(Sept. 1 Tr. at 42-43.) Thus, the absence of an official, printed IAQ from Defendant's A-file does not foreclose the possibility that ICE had notice of Defendant's presence and illegal status.

In *Ibarra-Reyes*, the court declined to hold that immigration officials possessed knowledge of the defendant's illegal presence based on an ambiguous NCIC inquiry report notification that did not indicate "how, or on what date, Immigration authorities were notified," nor "under what name, date of birth . . . or other identifiers the supposed notice was given." 2007 WL 4287753, at *3. By contrast, the Court here can ascertain that ICE official Lee Gaines received notice from Detective Farmer on or before May 16, 2007. Based on Detective Farmer's email and the corresponding post-it notes, the Court therefore finds that ICE had actual knowledge of Defendant's identity, presence in the United States and illegal status in 2007.

First, the A-file case closure summary states Defendant's true name ("Delfino De Leon Ramirez"), and the post-it notes placed on the case closure summary list the alias used in the Chesterfield Police Report ("Puac-Deleon, Delfino"). (Def.'s Ex. 1; Def.'s Ex. 6.) This shows that ICE had knowledge of Defendant's alias and connected it to his real name. Whether Defendant intended to conceal his identity and deceive authorities with his aliases bears no relevance at this point, because, rather than imputing ICE officials with the knowledge of state police, the federal immigration authorities, specifically Lee Gaines, possessed actual knowledge of Defendant's illegal presence. *See Vega-Pena*, 668 F. Supp. 2d at 746 (disregarding the defendant's use of an alias when federal immigration officials already had knowledge of the defendant's true and full name).[7]

---

[7]     While Defendant's use of aliases did not prevent authorities from discovering his true identity and obtaining knowledge of his illegal presence in the United States in 2007, Defendant's use of multiple names and birthdates is relevant to his intent to conceal himself and evade capture under 8 U.S.C. § 3290, the fugitive tolling statute, discussed below.

Second, the post-it notes list the address where Defendant lived in 2007. (Sept. 20 Tr. at 16-18; Def.'s Ex. 1; Def.'s Ex. 6.)  Thus, ICE knew of Defendant's physical presence.  Finally, the post-it notes describe Defendant's prior deportation, which alerted ICE to Defendant's illegal status. (Def.'s Ex. 6.)  Consequently, as of May 16, 2007 — the date of Detective Farmer's email — ICE had actual knowledge of Defendant's unlawful presence in the United States.

II.     **The Limitations Period is Tolled under 8 U.S.C. § 3290, Because Defendant Concealed Himself with the Intent to Avoid Arrest or Prosecution.**

The Government additionally argues that Defendant qualifies as a "fugitive" under 8 U.S.C. § 3290; therefore, the limitations period tolled while Defendant evaded arrest. (Gov't's Mem. Opp'n at 13-15.)  Specifically, the Government asserts that (1) Defendant's failure to appear at hearings in 2007 and 2016; (2) Defendant's use of multiple aliases; and, (3) the Chesterfield Police Department's initiation of a fugitive investigation and issuance of a capias warrant establish Defendant's fugitive status. (Sept. 1 Tr. at 24; Sept. 20 Tr. at 35; Gov't's Mem. Opp'n at 13-15.)  Defendant responds that the Government failed to produce evidence showing that Defendant concealed himself with the intent to flee from prosecution. (Def.'s Reply to Gov't's Mem. Opp'n ("Def.'s Reply") (ECF No. 18) at 4-5.)

Section 3290 provides that "[n]o statute of limitations shall extend to any person fleeing from justice." 8 U.S.C. § 3290.  This statute both prevents a defendant from benefitting from his own wrongful acts and affords the full protection of the statute of limitations to persons unaware of charges against them and lacking the intent to avoid capture. *United States v. Duff*, 931 F. Supp. 1306, 1311 (E.D. Va. 1996); *see also United States v. Buchanan*, 632 F. Supp. 2d 554, 561 (E.D. Va. 2009), *aff'd* 638 F.3d 448 (4th Cir. 2011), (noting that a "unifying principle" in the Fourth Circuit is that a defendant may not "obtain credit . . . by virtue of his own wrongful act") (citations omitted).  Some courts have held that a defendant's absence from the prosecution

district, regardless of intent to flee, suffices to establish fugitive status. *See Duff*, 931 F. Supp. at 1311 (collecting cases). The court in *Duff* rejected this approach, because such a low standard "renders the burden of proof nugatory and all but eviscerates any protection which the statute of limitations was designed to provide." *Id*. at 1312. Rather, the burden of proof falls on the Government to establish by a preponderance of the evidence that the defendant knew of the charges against him and concealed himself with the intent to avoid arrest or prosecution. *United States v. Brown*, 438 F. App'x 203, 205 (4th Cir. 2011); *Duff*, 931 F. Supp. at 1311-12; *see also United States v. Greever*, 134 F.3d 777, 780 (6th Cir. 1998) ("The more modern and prevalent case law clearly supports . . . that the government must prove that the defendant concealed himself with the intent to avoid prosecution.").[8]

Courts may infer intent to avoid arrest or prosecution from a defendant's "failure to surrender to authorities once he learns that charges against him are pending." *Duff*, 931 F. Supp. at 1312 (quoting *United States v. Catino*, 735 F.2d 718, 722 (2d Cir. 1984); *United States v. De Risio*, F. Supp. 82, 85 (S.D.N.Y. 1988)). The Government relies on *United States v. Brown*, where the court found that a defendant intended to flee from justice after state authorities released him on bond, and he subsequently failed to appear for his hearing. 438 F. App'x at 204. The statute of limitations tolled while the defendant evaded arrest for over eight years. *Id.*

Here, Defendant similarly failed to appear at his scheduled hearing on April 30, 2007, in Chesterfield County after obtaining release. (Sept. 1 Tr. at 25; Def.'s Ex. 2.) But the only paperwork signed by Defendant following his release on bond on February 28, 2007 incorrectly listed Defendant's hearing date as March 30, 2007. (Sept. 1 Tr. at 23; Def.'s Ex. 3.) The record

---

[8]    Here, the parties do not contest whether Defendant had knowledge of his pending charges, as established by Defendant's Exhibit 3 (bond paperwork, signed by Defendant, releasing him on charges for trespassing and larceny). The remaining issue focuses on whether Defendant concealed himself with the intent to avoid arrest or prosecution.

does not establish whether Defendant attempted to appear on March 30, 2007 or whether he knew that the court had actually scheduled his hearing one month later. However, unlike the decision in *Brown* — based on a single failure to appear — here, Defendant also failed to appear at a hearing following his 2016 arrest by Richmond police for assault and battery. (Gov't's Mem. Opp'n at 4-5, ¶18.)

As for Defendant's use of aliases, this District has explained that intent to flee from justice under § 3290 cannot be inferred from the fact that a defendant used a fictitious name without additional evidence from the government. *Duff*, 931 F. Supp. at 1313. In *Duff*, the court could not infer intent to avoid arrest, even though agents attempted to contact the defendant three times without success. *Id.* at 1314. Agents also talked to the defendant's parents, but did not inform them of their son's pending charges or the outstanding warrant for his arrest. *Id.* Finally, federal agents learned that, three months before the statute of limitations expired, New York City police had arrested the defendant on state firearm charges under an alias, but the federal authorities allowed the period to expire before arresting him. *Id.* The court rejected the government's argument that the defendant likely started to use a different name after learning that agents visited his parents, because the government failed to present any evidence showing that the defendant used an alias beyond that one occasion. *Id.* at 1313 ("In fact, [an agent] testified that he was not aware of any evidence that the [d]efendant ever used a fictitious name before the one instance in September of 1995.").

In this case, the Chesterfield Police Report shows that, upon arrest, Defendant presented a Mexican identification card with the name "Enrique Roblero Escobar." (Def.'s Ex. 1 at 4.) By running this information, Chesterfield police discovered that the FBI had record of Defendant under the name "Delfino Puac-Deleon" and that Virginia recognized him as "Alejandro

Hernandez." (Def.'s Ex. 1 at 4.) In addition to using at least three aliases,[9] the record shows

three different birthdates associated with Defendant. While the identification presented to

Chesterfield police with the name Enrique Escobar listed a birthdate of January 5, 1973,

Detective Farmer's May 13, 2007 email to Carr listed December 25, 1976 and May 22, 1974 as

the two birthdates associated with the Hernandez and Puac-Deleon aliases. (Def.'s Ex. 1 at 4;

Def.'s Ex. 5.) Thus, Defendant's use of multiple aliases and birthdates creates more proof of his

intent to evade arrest or prosecution than the defendant's single use of a fictitious name in *Duff*.

931 F. Supp. at 1313.[10]

Defendant's trail of false identities more closely resembles that of the defendant fugitive

in *Buchanan*, 632 F. Supp. 2d at 561 (noting that, over a thirteen-year period, the defendant

"traveled to numerous states and used numerous false names, social security numbers and birth

dates"). Citing *Buchanan*, the Government relies on the combination of Defendant's use of

aliases and failures to appear in 2007 and 2016 to establish that Defendant intended to flee from

justice under § 3290. (Gov't's Mem. Opp'n at 13 n.7, 15.) *Buchanan* addresses the "availability

---

[9]   The indictment lists two additional aliases — apparent variations or misspellings of
Defendant's true name — "Delfino Deleon-Ramerez" and "Delfino De Leonfino-Ramirez."
(Indictment (ECF. No. 3).)

[10]   Additionally, Defendant points to *United States v. Sotelo-Salgado*, 201 F. Supp. 2d 957,
964 (S.D. Iowa 2002), to show that a defendant's use of a false name upon arrest does not
establish fugitive status under § 3290. (Def.'s Reply at 5.) In that case, the court held that,
although the defendant presented aliases to law enforcement on multiple arrests, the government
did not meet its burden, because "[t]he only evidence supporting such a claim is unsubstantiated
testimony that on two occasions . . . the [d]efendant gave a false name to law enforcement upon
arrest." *Id.* at 966. The court further took issue with the fact that the government failed to show
how the defendant's use of false names hindered INS from apprehending him. *Id.* at 964-65.
Here, in addition to the use of aliases, the Government points to Defendant's two failures to
appear, as well as the capias warrant issued by Chesterfield police and the fugitive investigation
initiated to apprehend Defendant, which authorities were unable to accomplish until 2017. (Sept.
1 Tr. at 24; Sept. 20 Tr. at 35.) Regardless of this distinction, *Sotelo-Salgado* does not bind this
Court.

of tolling principles based on a defendant's flight or other wrongful act in the context of a supervisory period of probation."[11]  632 F. Supp. 2d at 562.  In addition to using false names, the defendant in *Buchanan* repeatedly failed to appear each time authorities arrested and released him on bond.  *Id.* at 561-62.  Accordingly, the court excluded the time period that the defendant spent as a fugitive from the calculation of his supervised release term.  *Id.* at 563.

Here, Defendant failed to appear at court hearings in 2007 and 2016.  (Sept. 1 Tr. at 25; Def.'s Ex. 2.; Gov't's Opp'n Mem. at 4-5, ¶ 18.)  Because of the confusion surrounding the date of Defendant's 2007 hearing and the lack of evidence presented by the Government regarding whether Defendant appeared on March 30, 2007 (the date corresponding to his signed bond paperwork) or knew to appear on April 30, 2007 (the actual hearing date), Defendant's failure to appear in 2007 does not rise to the level of the fugitive's behavior in *Buchanan*.  *See* 632 F. Supp. 2d at 561-62 (defendant arrested several times and "each time defendant was . . . placed on bond following allegations of new criminal conduct . . . , he once again fled to avoid facing trial in those new criminal proceedings").  However, Defendant's failure to appear in 2007 coupled with the additional failure to appear in 2016, and his use of multiple aliases indicate Defendant's intent to conceal himself and avoid arrest or prosecution.

To establish Defendant's fugitive status, the Government also points to the Chesterfield Police Department's initiation of a fugitive investigation and issuance of a capias warrant.  (Sept. 1 Tr. at 24; Sept. 20 Tr. at 35; Def.'s Ex. 2.)  While the Fourth Circuit focuses on the intent of an individual to evade capture, other circuits have noted that "the nature and the extent of the efforts of government agents to locate the defendant is one factor to consider in determining whether it

---

[11]      Although *Buchanan* deals with fugitive tolling in another context, the Fourth Circuit cited § 3290 as an "analogous circumstance[]" showing the "strong federal policy disfavoring fugitives" in their opinion affirming the district court's decision.  638 F.3d at 453 n. 3.

is reasonable to infer from the agents' failure to locate the defendant that the defendant was acting with the intent to avoid arrest or prosecution." *Greever*, 134 F.3d at 780 n.1; *United States v. Hamilton*, 538 F.3d 162, 171 (2d Cir. 2008). In *Greever*, the Sixth Circuit found that the government met its burden by showing, among other things, that the government searched for the defendant at the location listed on his driver's license and entered the defendant's name into databases on at least sixteen occasions. 134 F.3d at 780-81. Similarly, the Second Circuit in *Hamilton* found that the government carried its burden of establishing fugitive status by presenting testimony and reports from the lead investigator on the defendant's case. 538 F.3d at 171-72. There, the investigator testified about how he elicited information that the defendant planned to fly from Atlanta to Los Angeles, which eventually led to the defendant's arrest in an airport. *Id.* at 172.

In this case, the Government relies on the fact that the Chesterfield Police Department issued a capias on May 1, 2007, and initiated a fugitive investigation. (Sept. 1 Tr. at 8, 24; Def.'s Ex. 2.) Unlike the evidence presented in *Greever* and *Hamilton*, the Government did not present any testimony or evidence from Detective Farmer about the efforts made to locate Defendant, including whether Detective Farmer or other authorities ever visited the Cricklewood address listed in the 2007 Chesterfield Police Report. However, Detective Farmer did reach out to Carr, a U.S. Marshals Analyst, shortly after Chesterfield police issued the capias. (Def.'s Ex. 5.) In his May 13, 2007 email, Detective Farmer asked whether Carr had a contact in the United States Probation Office, because he "[was] looking for Delfino Puac-Deleon aka Alejandro Hernandez." (Def.'s Ex. 5.) Again on May 16, 2007, Detective Farmer emailed Carr that he "talked to Lee Gaines with ICE" and inquired about whether Defendant had continuing probation obligations. (Def.'s Ex. 5.) Carr forwarded the information to United States Probation Officer

Kristen James, which prompted this Court to issue a warrant on July 2, 2007, ordering Defendant to show cause why his supervision should not be revoked. (Pet. on Supervised Release.) As a single, non-determinative factor to consider in the fugitive analysis, the email correspondence, as well as the warrants issued by both Chesterfield police and this Court, further show that Defendant concealed himself and avoided capture, despite the initiative taken by state and federal law enforcement to apprehend him.

Of course, all of Defendant's conduct must also be viewed in the context of his repeated efforts to illegally enter the United States and avoid detection of his illegal status. Defendant not only repeatedly lied about his identity, he actually created fictitious identification documents to conceal his identity. (Sept. 1 Tr. at 36.) Indeed, he was convicted of this offense in 2005 and then surreptitiously reentered the United States. (Sept. 1 Tr. at 36; Gov't's Mem. Opp'n at 3, ¶ 12.) He then again utilized fictitious names to avoid detection. (Def.'s Ex. 1 at 4.) Consequently, Defendant's pattern of conduct readily establishes that he acted to avoid detection and arrest.

Accordingly, the Government has established by a preponderance of the evidence that Defendant, through the use of aliases and failure to appear at court hearings, concealed himself with the intent to avoid arrest and prosecution. Although state and federal authorities took steps to apprehend him, Defendant avoided capture until 2017. Because Defendant "fle[d] from justice" under § 3290, the applicable five-year statute of limitations tolled for the approximately ten years that Defendant evaded authorities. Therefore, the Government's indictment does not offend the statute of limitations.

## CONCLUSION

For the reasons stated above, the Court recommends that Defendant's Motion to Dismiss the Indictment (ECF No. 8) be DENIED.

Let the clerk forward a copy of this Report and Recommendation to all counsel of record and to United States District Judge Henry E. Hudson.

## NOTICE TO PARTIES

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a de novo review of the determinations contained in the report and such failure shall bar you from attacking on appeal the findings and conclusions accepted and adopted by the District Judge except upon grounds of plain error.**

/s/
David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date: October 10 2017